METROPOLITAN HOUSING DEVELOPMENT CORP. et al., Plaintiffs-Appellees,

v.

VILLAGE OF ARLINGTON HEIGHTS et al., Defendants,

and

Village of Mount Prospect and Forest View Civic Association, Intervening Defendants-Appellants.

Nos. 79–1483, 79–1484.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1979.

Decided March 4, 1980.

Rehearing and Rehearing In Banc Denied May 16, 1980.

See also, 7 Cir., 558 F.2d 1283.

R. Marlin Smith, Chicago, Ill., for Village of Mount Prospect.

Morris S. Bromberg, Chicago, Ill., for Forest View Civic Assn.

F. Willis Caruso, Chicago, Ill., for plaintiffs-appellees.

Before PELL and SPRECHER, Circuit Judges, and ACKERMAN, District Judge.*

SPRECHER, Circuit Judge.

The sole issue in this appeal, although variously phrased in different objections, is whether the district court properly approved and entered a consent decree terminating the seven-year Arlington Heights

exclusionary zoning dispute. We conclude that the court acted properly and affirm.

## I

Metropolitan Housing Development Corporation (MHDC), a nonprofit corporation organized for the purpose of developing low- and moderate-income housing throughout the Chicago metropolitan area, and individual plaintiffs brought this action alleging that the refusal of the Village of Arlington Heights to rezone a 15-acre tract of land for multiple-family use was racially discriminatory in violation of the Fourteenth Amendment and the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq.[1]

After a bench trial, the district court entered judgment for Arlington Heights, 373 F.Supp. 208 (N.D.Ill.1974). This court reversed, finding that the "ultimate effect" of the denial was racially discriminatory, and that the refusal to rezone therefore violated the Fourteenth Amendment. 517 F.2d 409, 414–15 (7th Cir. 1975).

The Supreme Court reversed, holding that although we had concluded that Arlington Heights' zoning decision had a racially discriminatory effect, under *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), decided after our opinion, a showing of discriminatory intent was a prerequisite to establishing a violation of the Equal Protection Clause. Since we had affirmed the district court's finding that there was no discriminatory purpose behind the refusal to rezone, the Supreme Court held that the plaintiffs had suffered no deprivation of their constitutional rights. 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

---

* The Honorable J. Waldo Ackerman of the United States District Court for the Central District of Illinois is sitting by designation.

1. The Supreme Court has passed upon the standing of the plaintiffs, holding that "[c]learly MHDC has met the constitutional requirements, and it therefore has standing to assert its own rights" insofar as "irrational zoning actions" are concerned. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50

L.Ed.2d 450 (1977). However, insofar as the case involves racial discrimination, MHDC has no racial identity, but the Court was not required to pursue the implications of that fact inasmuch as one of the individual plaintiffs, Ransom, is black and is employed in Arlington Heights. Therefore an " 'actionable causal relationship' " exists between Arlington Heights' zoning practices and his asserted injury. *Id.* at 264, 97 S.Ct. at 562.

The Supreme Court then remanded the case for a determination of whether Arlington Heights' conduct, although constitutionally unassailable, violated the Fair Housing Act. In our first opinion we had not decided the statutory question because, although plaintiffs' complaint alleged violation of the Fair Housing Act, they had not pursued the statutory claim either in the district court or before us.

Upon remand, we reaffirmed our earlier holding that the village's refusal to rezone had a discriminatory effect. In the second opinion we were required to determine whether the refusal to rezone with a discriminatory effect violated the Fair Housing Act although accomplished without discriminatory intent. MHDC had attempted to effectuate, within Arlington Heights, the national policy of integrated housing through development of its own property without any requirement of active village involvement, financial or otherwise. We concluded that although Arlington Heights was acting within its proper state zoning authority, its action had frustrated MHDC's efforts. 558 F.2d 1283 (7th Cir. 1977).

Upon our remand to the district court, we held that inasmuch as Arlington Heights has a standing obligation under the Fair Housing Act to refrain from perpetuation of zoning policies that effectively foreclose construction of low-cost housing, the district court should require the village to identify a parcel of land within its boundaries which is both properly zoned and suitable for low-cost housing under federal standards. "If defendant fails to satisfy this burden, the district court should conclude that the Village's refusal to rezone effectively precluded plaintiffs from constructing low-cost housing within Arlington Heights, and should grant plaintiffs the relief they seek." 558 F.2d at 1295 [footnote omitted]. The Supreme Court denied certiorari in 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

After the case reached the district court on remand, the court called the matter for a status report on March 9, 1978, and was advised by the parties that negotiations for settlement were pending and that the case would probably be resolved by a consent decree. After several other status-report hearings the court was advised on June 1, and on June 22, 1978, that a consent decree had been agreed upon by the parties. On June 30, the Village of Mount Prospect moved to intervene as a defendant in order to object to the entry of the proposed consent decree. 469 F.Supp. 836 at 843.

On July 5, 1978, the Board of Trustees of Arlington Heights held an open meeting to receive public comment on the proposed consent decree, which the Board had previously developed in closed sessions based upon negotiations carried on among the parties' lawyers. Addressing the Board at the meeting which began at 8:08 p. m. was the Mayor of Mount Prospect, who requested additional time to review the proposed decree inasmuch as it involved property bordering on her village. One of the attorneys representing Mount Prospect addressed the meeting at length. About 30 citizens of Arlington Heights and Mount Prospect spoke, as did representatives of the League of Women Voters, the Northwest Opportunity Center, the Congress of Maine Township Homeowners Association and the Forest View Civic Association. Most of the members of the Board of Trustees also addressed the meeting. By a vote of seven to one, the Board approved the proposed consent decree and the meeting adjourned at 11:04 p. m.

On August 21, 1978, the district court granted Mount Prospect, in its corporate capacity as a representative of its residents, permissive intervention. On August 24, the court allowed Forest View Civic Association and six individuals, all of whom were either property owners or representatives of owners of land north and west of the affected property, to intervene as defendants. On September 18, the Surrey Ridge Homeowners Association, the Heritage Park Community Association, Inc., and three individuals, all owners or representing owners of neighboring land, were given leave to intervene. 469 F.Supp. at 844.

The district court held three days of hearings on September 25, 27 and 29, 1978. Attorneys appeared on behalf of the plaintiffs, Arlington Heights, Mount Prospect, the Forest View Civic Association and the Heritage Park Community Association. The court heard 19 witnesses and the intervenors caused 23 exhibits to be introduced, including 24 photographs introduced under two exhibit numbers. The parties were allowed to file proposed findings of fact and conclusions of law as well as briefs.

On April 2, 1979, District Judge Bua issued his findings of fact, conclusions of law, opinion and order entering the consent decree, which appear in 469 F.Supp. 836–69. The consent decree which he approved appears in 469 F.Supp. 869–73. Judge Bua analyzed the decree as it was proposed, in the light of the objections offered, with such commendable and painstaking detail that we adopt, as well as affirm, his opinion except insofar as this opinion of affirmance may add to or vary its language. Because the objections of the intervenors overlap to a considerable degree and raise broad issues, it is necessary to deal with them to some extent from the viewpoint of overall policies which affect them all.

Intervenor Mount Prospect has raised four objections: (1) the district court did not have jurisdiction or authority to enter the consent decree; (2) the decision of Arlington Heights to approve the consent decree abridged Mount Prospect's right to procedural due process; (3) Arlington Heights' approval was procedurally and substantively unlawful; and (4) the district court's decree "improperly intruded judicial authority into the legislative process." Intervenor Forest View Civic Association adopted Mount Prospect's objections and added (5) that the property to be annexed and rezoned was not originally in Arlington Heights but instead adjoins properties of intervenors.

## II

The original 15-acre parcel was part of an 80-acre tract just east of the center of Arlington Heights owned by the Clerics of St. Viator, a religious order, whose high school and novitiate building occupied part of the site. All the land surrounding the Viatorian property had been zoned R–3, a single-family specification with relatively small minimum lot-size requirements. On three sides of the Viatorian land there were single-family houses just across a street; to the east the Viatorian property directly adjoined the backyards of other single-family homes. 429 U.S. at 255, 97 S.Ct. at 558.

The plans for the original site called for clustered townhouse units for low- and moderate-income tenants housed in 20 two-story buildings with 190 units, each unit having its own private entrance from the outside. One hundred of the units would have a single bedroom, thought likely to attract elderly citizens. The remaining 90 units would have two, three or four bedrooms. A large portion of the site would remain open, with shrubs and trees to screen the homes abutting the property to the east. 429 U.S. at 254, 257, 97 S.Ct. at 559.

The alternate site provided for in the consent decree consists of 26 acres of vacant property located in an unincorporated area of Cook County between Arlington Heights and the Village of Mount Prospect, presently classified partially C–2 Commercial and partially R–5 Single Family Residence use under the Cook County Zoning Ordinance. Under the terms of the consent decree 14 acres of the property would be developed for commercial use by an independent developer and would include two restaurants. 469 F.Supp. at 843, 870.

The remaining 12-acre parcel would be developed to consist of one four-story building with 109 one-bedroom rental apartments available to elderly persons and one two-bedroom apartment available for the apartment manager. Attached townhouses two-stories high would consist of 20 one-bedroom, 40 two-bedroom and 20 three-bedroom units, all available for family use. 469 F.Supp. at 871.

The total parcel involved is bounded on the north by Lawrence Lane and by Prairie Park, a 10-acre park which is part of the

Arlington Heights Park District, on the east by a vacant parcel of land lying north and west of St. Cecilia Catholic Church, on the south by Golf Road, and on the west by Belmont Avenue, extended from its present location adjacent to the western boundary of Prairie Park to Golf Road. 469 F.Supp. at 843. The original site had existing single-family use on three sides and an institutional use on the fourth side. The new site has an institutional use on one side, vacant and park land on one side, a four-lane highway on one side, and some residential use on the fourth side.

The Cook County Comprehensive Plan, which is the county's long-range projection of land use, recommended that the property fronting along Golf Road be used for commercial purposes and that the remaining portion be used for multiple-family purposes. Tr. 360–61. The single-family classification assigned to part of the property by the Arlington Heights Comprehensive Plan was merely a "holding zone" open for negotiation with a subsequent developer. 469 F.Supp. at 867. Along Golf Road but to the south of the street (the subject property lies to the north of Golf Road) there is a "mirror image" of the consent decree development, employing commercial uses along the road and multiple-family use behind it in a 30-acre planned unit development. Tr. 364.

About 80% of the perimeter of the subject property is currently zoned for single-family residence. However, there was testimony and the district court found that many other land uses are compatible with single-family housing; that all single-family housing cannot be surrounded on all sides by other single-family housing; that the use planned for the subject property follows a natural zoning progression from more intensive to less intensive uses—from arterial road, to commercial use, to multiple-family housing, to single-family housing; that there are many instances of single-family residences adjoining multiple-family units

within two miles of the subject property; and that there is other multiple-family housing within 600 feet of the site. 469 F.Supp. at 866.

### III

In the present posture of this case, there is no longer an issue of the interest of a state or its municipality versus the national interest; the local and national governmental interests are now aligned together against the alleged rights of individual neighboring landowners and of an adjoining village. The changed alignment of interests from that formerly existing requires us to analyze the various interests and the policies they represent in terms of national policies supporting open housing, state and local policies supporting the actions required of Arlington Heights by the consent decree, and the policies supporting the use of consent decrees which effectuate the amalgam of the national and local interests in housing cases such as this.

### A

Congress has declared in the Fair Housing Act[2] that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Section 3604(a) of the Act provides in part that "it shall be unlawful . . . [t]o . . . make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin."

Arlington Heights' prior refusal to rezone the original site constituted a violation of § 3604(a) "if there is no land other than plaintiffs' property within Arlington Heights which is both properly zoned and suitable for federally subsidized low-cost housing." 558 F.2d at 1294. The burden of identifying such a parcel of land within Arlington Heights was placed upon Arlington Heights. By failing to do so and by entering into a consent decree agreeing to annex and rezone property then outside of

2. The Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, was enacted as Title VIII of the Civil Rights Act of 1968.

Arlington Heights, the defendant village in effect conceded that there was no property then within Arlington Heights which was both zoned and suitable for low-cost housing. Absent the consent decree, Arlington Heights was subject to having imposed upon it the relief which the plaintiffs sought.

■ The language of the Fair Housing Act is "broad and inclusive," subject to "generous construction," and "complaints by private persons are the primary method of obtaining compliance with the Act." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 212, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972). Generally, and particularly in a fair housing situation, the existence of a federal statutory right implies the existence of all measures necessary and appropriate to protect federal rights and implement federal policies. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969).

The courts of appeals, recognizing these policies, regularly have provided relief from exclusionary zoning (or its equivalent by refusal to permit tying into city's water and sewer systems through denial of annexation or issuance of permit) under the Fair Housing Act. *Kennedy Park Homes Ass'n, Inc. v. City of Lackawanna*, 436 F.2d 108 (2d Cir. 1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); *United Farmworkers v. City of Delray Beach*, 493 F.2d 799 (5th Cir. 1974); *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).

The relief normally granted by both federal and state courts in exclusionary zoning cases is what has become known as "site-specific relief," that is, the opening up of a particular parcel to low- or moderate-income multiple housing on a case-by-case basis. *Developments in the Law—Zoning*,

91 Harv.L.Rev. 1427, 1695–99 (1978). Such relief ordinarily runs counter to local zoning or other local legislation, but given the national open housing policy established by Congress, acting under the Civil War Amendments, the state or local legislation must yield to the paramount national policy. The Supreme Court has left no doubt as to the outcome of such a conflict between local and national interests:

> There can be no doubt that this line of cases [*Ex parte Virginia*, 100 U.S. 339 [25 L.Ed. 676] (1880); *South Carolina v. Katzenbach*, 383 U.S. 301, 308 [86 S.Ct. 803, 808, 15 L.Ed.2d 769] (1966); *Mitchem v. Foster*, 407 U.S. 225, 238–39 [92 S.Ct. 2151, 2160, 32 L.Ed.2d 705] (1972)] has sanctioned intrusions by Congress, acting under the Civil War Amendments, into the judicial, executive, and legislative spheres of autonomy previously reserved to the States. The legislation considered in each case was grounded on the expansion of Congress' powers—with the corresponding diminution of state sovereignty—found to be intended by the Framers and made part of the Constitution upon the States' ratification of those Amendments  .   .  ..

*Fitzpatrick v. Bitzer*, 427 U.S. 445, 455–56, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976).

### B

Local zoning ordinances "find their justification in some aspect of the police power, asserted for the public welfare." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926). The ordinance approved in *Euclid* provided for the separation of land uses and not for the total exclusion of certain uses by means of land use selection.[3] In noting that apartment houses might "come very near to being nuisances" in certain residential areas, the Court also pointed out that "in a different environment [they] would be not only entirely unobjectionable but highly desirable  .   .  .." *Id.* at 394–95, 47 S.Ct. at

---

**3.** Nor did *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) approve exclusionary zoning. *Developments in* the *Law—Zoning*, 91 Harv.L.Rev. 1427, 1628–29 n. 19 (1978).

121. The Court went on to hold that "[i]f the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." *Id.* at 388, 47 S.Ct. at 118. Where a landowner attacks a legislative zoning determination on the broad ground that it reduces the value and marketability of his land, in order to prevail he must show that it bears no substantial relation to the public health, safety, morals, or general welfare. *Id.* at 395, 47 S.Ct. at 121.

The national policy discussed in Part A above establishes that the annexation and rezoning required of Arlington Heights by the consent decree bears a substantial relation to the general welfare.

The authority to zone the subject property belongs exclusively to Arlington Heights and not to Mount Prospect, pursuant to the express terms of a boundary agreement between Mount Prospect and Arlington Heights dated June 21, 1976. 469 F.Supp. at 843 n. 5. Inasmuch as the annexation of the property has already been accomplished, the rezoning will be of property within the boundaries of Arlington Heights.[4]

Arlington Heights is a home rule municipality[5] vested with broad state constitutional powers which include zoning powers. *Johnny Bruce Co. v. City of Champaign,* 24 Ill.App.3d 900, 321 N.E.2d 469, 471 (1974). Preexisting legislative provisions which lim-ited the authority of municipalities which became home rule units may now be superseded by valid legislative action of a home rule unit. 321 N.E.2d at 472; see also *Clarke v. Village of Arlington Heights,* 57 Ill.2d 50, 309 N.E.2d 576, 579 (1974). The Board of Trustees of the Village of Arlington Heights in an open meeting where public comment was received, approved the consent decree as a legislative act. The consent decree included the annexation of land not then within the boundaries of Arlington Heights and its rezoning for commercial and multiple-family use for a period of five years.

Illinois courts are in the process of delineating the home rule power of municipalities in various areas on a case-by-case basis, but they have already clearly held that, in addition to the broad state constitutional powers, home rule units have whatever additional powers are granted by the state legislature to non-home rule municipalities. In *City of Carbondale v. Van Natta,* 61 Ill.2d 483, 338 N.E.2d 19, 23–24 (1975), the Illinois Supreme Court held that although the 1970 constitution did not confer extraterritorial sovereign or governmental powers on home rule units of local government, a home rule municipality possesses the same statutory powers to zone extraterritorially as non-home rule municipalities.[6] See also *Kru-*

---

4. Illinois statutes provide that "[t]he corporate authorities of any municipality may enter into an agreement with one or more of the owners of record of land in any territory which may be annexed to such municipality as provided in Article 7 such agreement to be valid and binding for a period of not to exceed 10 years from the date of execution thereof" and this statute "is not a *limit* upon any municipality which is a home rule unit." Ill.Rev.Stats. c. 24, § 11–15.-1–1 [emphasis supplied]. The agreement contained in the consent decree is binding for only 5 years.

5. Ill.Const.1970, Art. VII, § 6(a): "any municipality which has a population of more than 25,000 [is a] home rule [unit]." Arlington Heights has a population exceeding 64,000. 558 F.2d at 1286.

Except as limited expressly by the state constitution (which does not include any zoning restrictions), "a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare . . . ." Ill.Const.1970, Art. VII, § 6(a). The state constitution further provides that "Powers and functions of home rule units shall be construed liberally." Art. VII, § 6(m). The constitution conferred upon home rule units "a grant of authority which probably was the broadest in the nation" and established "a new presumption in favor of municipal and county rule." *Carlson v. Briceland,* 61 Ill. App.3d 120, 18 Ill.Dec. 502, 504, 377 N.E.2d 1138, 1140 (1978).

See also *Cain v. American Nat. Bank,* 26 Ill.App.3d 574, 325 N.E.2d 799, 805 (1975).

6. Non-home rule municipalities in Illinois may exercise such zoning powers as classification, regulation and allocation of uses "within the corporate limits or within contiguous territory not more than one and one-half miles beyond the corporate limits and not included within

*ghoff v. City of Naperville,* 68 Ill.2d 352, 12 Ill.Dec. 185, 187, 369 N.E.2d 892, 894 (1977).

The United States Supreme Court recently observed that "[n]othing in the *Milliken* [*Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069] decision suggests a *per se* rule that federal courts lack authority to order parties found to have violated the Constitution to undertake remedial efforts beyond the municipal boundaries of the city where the violation occurred." *Hills v. Gautreaux,* 425 U.S. 284, 298, 96 S.Ct. 1538, 1546, 47 L.Ed.2d 792 (1976) [footnote omitted]. *Gautreaux* approved a metropolitan area remedy in a housing situation where such a remedy "need not displace the rights and powers accorded suburban governmental entities under federal or state law." *Id.* at 298 n. 13, 96 S.Ct. at 1546.

The consent decree here does not "displace the rights and powers accorded suburban governmental entities" to effectuate annexation and rezoning, but, with Arlington Heights' consent and its home rule legislative act, provides "site-specific" relief through judicial process.[7]

State policy establishes that the annexation and rezoning required of Arlington Heights by the consent decree bear a substantial relation to the general welfare. Illinois courts have considered the need for low-cost multiple dwellings as a factor in approving suitable zoning.[8]

C

■ The often diverse interests of national policy and local zoning have merged here in the consent decree, which carries, in addition, its own presumption of regularity and is subject to approval by the trial court after hearing proffered objections.

■ The law generally favors and encourages settlements. *Airline Stewards and Stewardesses Ass'n v. American Airlines, Inc.,* 573 F.2d 960, 963 (7th Cir. 1978), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1979); *Dawson v. Pastrick,* 600 F.2d 70, 75 (7th Cir. 1979). Of course, this case involves not only the private plaintiffs, defendants and intervenors, but the public policies outlined above in Parts A and B.[9]

---

any municipality." Ill.Rev.Stats. c. 24, § 11–13–1. One and one-half miles equal 7,920 feet. The subject property is contiguous, is not included within any other municipality, and is within 1,200 feet of the boundary of Arlington Heights. Tr. 21.

7. Intervenors rely heavily on the intermediate appellate court decision in Illinois, *Martin v. City of Greenville,* 54 Ill.App.3d 42, 12 Ill.Dec. 46, 369 N.E.2d 543 (1977), where the court reversed a consent decree enforcing a settlement in a case (1) where it was "not completely clear" that the city council formally approved the settlement; (2) where a non-home rule municipality was involved; and (3) where Fair Housing Act violations were not involved.

8. *Lakeland Bluff, Inc. v. County of Will,* 114 Ill.App.2d 267, 252 N.E.2d 765 (1969) (need for low-cost housing justified mobile home zoning); *Chicago Title & Trust Co. v. Village of Skokie,* 61 Ill.App.3d 219, 18 Ill.Dec. 617, 377 N.E.2d 1253 (1978) (demand for apartments justified suitable zoning).

The minutes of the Arlington Heights Board of Trustees' meeting of July 5, 1978, which are part of the record here, state: "President Ryan responded that there are over 162 people locally that did not get into the senior citizen housing project and that there is an actual demon-

strated need for senior housing." Minutes, at p. 8.

9. The Supreme Court set forth some of the basic standards for assessing consent decrees in *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971):

Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right

■ While the public objectives embodied in the Fair Housing Act warrant a careful review of the consent decree in light of those policies, the clear policy in favor of encouraging settlements must also be considered, particularly in the area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals. *Patterson v. Newspaper and Mail Deliverers' Union*, 514 F.2d 767, 771 (2d Cir. 1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). The resolution of housing disputes by community agreement engenders the crucial community support necessary for their long-range success.[10] *Williamsburg Fair Housing Committee v. New York City Housing Authority*, 450 F.Supp. 602, 606 (S.D.N.Y.1978).

Because of the consensual nature of the decree, voluntary compliance is rendered more likely. In addition, the plaintiffs may have expeditious access to the court for appropriate sanctions if compliance is not forthcoming. *United States v. City of Jackson*, 519 F.2d 1147, 1152 n. 9 (5th Cir. 1975).[11]

Courts have held in discriminatory employment cases that Title VII clearly expresses an intent to encourage settlements, *Flinn v. FMC Corp.*, 528 F.2d 1169, 1174 (4th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), based upon the authority vested in the court to order affirmative action,[12] *United States v. Wood, Wire & Metal Lathers International Union*, 471 F.2d 408, 413 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973), and the emphasis placed by the act upon voluntary conciliation. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).

A similar policy in favor of settlement can be found in the Fair Housing Act. The Act provides that in civil actions the court may "enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate," 42 U.S.C. § 3610(d), and provides for voluntary conciliation. 42 U.S.C. §§ 3608(b), 3610(a). Most significantly, the Fair Housing Act provides that "the court shall continue such civil case . . . from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in the complaint . . . ." 42 U.S.C. § 3612(a).

■ Therefore, in this case under the Fair Housing Act national policy also strongly favors settlement. The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties. *Airline Stewards and Stewardesses Ass'n v. American Airlines, supra*, 573 F.2d at 963; *Dawson v. Pastrick, supra*, 600 F.2d at 75; *United States v. City of Jackson, supra*, 519 F.2d at 1151. Objectors must be given reasonable notice and their objections heard and considered.

The trial judge permitted the earliest objector to move to intervene on June 30, 1978; intervention was granted to various objectors on August 21 and 24 and September 18; an evidentiary hearing on objections was held for three days, September 25,

to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

10. Settlements also contribute greatly to the efficient utilization of scarce federal judicial resources. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).

11. Defendants minimize costly litigation and adverse publicity and avoid the collateral effects of adjudicated guilt. *Id.*

12. In civil actions by aggrieved parties under Title VII the courts are empowered to "order such affirmative action as may be appropriate." 42 U.S.C. § 2000e–5(g).

27 and 29, 1978; and the court entered its comprehensive findings, conclusions and opinion on April 2, 1979, after all parties had the opportunity to file briefs and proposed findings and conclusions. 469 F.Supp. 836–73.

The trial judge fulfilled his responsibilities in determining that the settlement embodied in the consent decree was fair, adequate, reasonable and appropriate, and his opinion shows how carefully he analyzed the facts of the case in relation to the relevant principles of applicable law.

■ Accordingly, when an agreement has been approved by the district court, it will not be reversed on appeal unless there is plain error or an abuse of discretion or if the court acted arbitrarily or failed to satisfy itself that the settlement was equitable and in the public interest. *Dawson v. Pastrick, supra*, 600 F.2d at 75; *Cotton v. Hinton, supra*, 559 F.2d at 1331; *Patterson v. Newspaper and Mail Deliverers' Union, supra*, 514 F.2d at 771.

## IV

■ Most of the intervenors' objections are encompassed in Part III. The intervenors also complain that a finding of a constitutional or statutory violation was a necessary predicate to the entry of a consent decree.

The Supreme Court upheld the validity of a consent decree entered under the Sherman and Clayton Anti-Trust Acts against arguments that the courts lacked jurisdiction because there was no case or controversy and because the consent decree was entered without the support of facts, saying in *Swift & Co. v. United States*, 276 U.S. 311, 327, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928):

> The argument is that jurisdiction under the Anti-Trust Acts cannot be conferred by consent; that jurisdiction can exist only if the transactions complained of are in fact violations of the Act; that merely to allege facts showing violation of the anti-trust laws is not sufficient; that the facts must also be established according to the regular course of chancery procedure; that this requires either admission or proof; and that, here, there was no admission but, on the contrary, a denial of the allegations of the bill, and a recital in the decree that the defendants maintain the truth of their answers, assert their innocence, and consent to the entry of the decree without any finding of fact, only upon condition that their consent shall not constitute or be considered an admission. The argument ignores both the nature of injunctions, already discussed, and the legal implications of a consent decree. The allegations of the bill not specifically denied may have afforded ample basis for a decree limited to future acts.

■ The intervenors also claim that the procedures leading to the approval of the consent decree deprived them of due process. Assuming that some due process applies, the question is what process is due. Due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The weighing and analysis of the many interests involved in this case against the private interests of the intervenors, *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), confirms the district court's conclusion that the intervenors received all the process that was due.

The district court has adequately considered the intervenors' other objections. 469 F.Supp. 836. We affirm the court's judgment approving the consent decree.

PELL, Circuit Judge, dissenting.

This important and much discussed zoning discrimination case was commenced in 1972. It originally involved a claim that the refusal of Arlington Heights to rezone a certain specified tract of land to permit construction of a racially integrated, moderate and low income housing project was racially discriminatory and therefore in violation of plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment and the Fair Housing Act, 42 U.S.C. §§ 3601–3631.

The ensuing procedural course of the matter is set forth in detail, both in the majority opinion and in the opinion of the court below. *See Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 469 F.Supp. 836, 841–44 (N.D.Ill. 1979). I find it troubling, however, that at no time during the last seven years of litigation has this lawsuit involved the particular parcel of property which is suddenly made the subject of the consent decree now approved by a majority of this panel.

I find this especially troubling because the decree has prejudiced the rights of persons not parties to the original litigation, particularly in light of the fact that the original site upon which plaintiffs had hoped to build an integrated housing development was centrally located within the village limits of Arlington Heights, while the new site was, until after entry of the decree below, not in Arlington Heights at all. Rather, it was a tract of land located adjacent to the Village of Mount Prospect in unincorporated Cook County, which, pursuant to the terms of the consent decree, was to be annexed and rezoned to permit development of low and middle income housing and extensive commercial usage.[1]

In arguing that this court affirm the district court's approval of the decree, Arlington Heights and the MHDC rely heavily on the strong federal policy, embodied in the Fair Housing Act, which favors and, indeed, mandates the elimination of the effects of racial discrimination in housing, and further upon the policy which favors settlement of litigation. I do not find these policy arguments persuasive because the method chosen by Arlington Heights to effectuate its ever so recently espoused goal of providing a location for the construction of racially integrated housing has involved the selection of a site as far as possible from the center of Arlington Heights and on the doorstep of a neighboring community. My concern is heightened by the fact that the decision by Arlington Heights to pursue this particular course of action was made in complete derogation of state and local laws governing such procedures. The nature of the goal of open housing is such that it will not likely be achieved

> through the imposition upon the community of solutions not of the community's own design and thus quite likely lacking the community's support and confidence. The Court cannot force persons to live in the community; the continued or increased presence of any element of the ethnic makeup of a neighborhood, and thus the success of the Act's goal of supporting integration in the community, will depend largely on the willingness of individuals and groups to live there.

*Williamsburg Fair Housing Committee v. New York City Housing Authority,* 450 F.Supp. 602, 606 (S.D.N.Y.1978). I query in this instance how the support of those living in the areas adjacent to the project is to be enlisted when they have been denied the right granted to them under state law to participate in the decisionmaking process.

I am therefore of the opinion that many of intervenors' objections to the approval of the decree are well taken. I find it unnecessary to address most of the objections at this time, however, because it seems clear to me beyond reasonable disputation that the action of Arlington Heights in entering into the agreement in question was violative of the intervenors' federal constitutional right to procedural due process.

I therefore think that this case would be properly disposed of by a remand to the district court with directions to vacate the decree and to enjoin the parties from carrying out its terms until such time as intervenors have been afforded proper notice and an opportunity for a hearing, as is provided in the statutes of the state of Illinois. Adherence to these state procedures would, of course, cure any federal constitutional defect.

---

1. Because the intervenors did not seek a stay of the decree pending appeal, and because the decree provided for annexation of the property within sixty days of the entry of the decree, the annexation has already been accomplished. This annexation may, however, be void due to the failure of Arlington Heights to comply with Illinois law. *See* discussion *infra.*

## I.

### A. The Requirements of Illinois Law

The Illinois zoning enabling legislation, Ill.Rev.Stat. ch. 24, § 11–13–14, requires a public hearing on amendments to zoning ordinances before a "commission or committee designated by the corporate authorities" and further requires that notice be given of such a hearing not more than thirty nor less than fifteen days before the hearing. The "corporate authority" which was designated by the Village of Arlington Heights in its zoning ordinance was the Plan Commission. Arlington Heights Zoning Regulations, § 19.1. It is undisputed that, despite the fact that the decree will result in comprehensive amendments to the tract's current zoning classification, no hearing before the Plan Commission was ever held. Further, the notice which was required by the local regulation consisted of published notice to the public and actual notice to nearby landowners. *See id.* at § 19.2. It is again undisputed that no such notice was ever given. Finally, with respect to the annexation, the Illinois Annexation Agreement Act provides that where, as here, a tract is the subject of a previous annexation agreement, "any public hearing required by law to be held before the adoption of any ordinance amendment provided in such agreement shall be held prior to the execution of the agreement, and all ordinance amendments provided in such agreement shall be enacted according to law." Ill.Rev.Stat. ch. 24, § 11–15.1–2. This statutory directive has, however, likewise been ignored.

Rather, the decision to enter into the agreement, with its attendant annexation and zoning amendments, was made in a series of closed meetings of the Village Board of Trustees, beginning in March of 1978.[2] Subsequently, on June 1 and June 28 of that year, the parties informed the district court that a consent decree had been agreed upon and the matter was continued to June 30 for entry of that decree. On that date, the neighboring Village of Mount Prospect moved to intervene and it was only thereafter, on July 5, that the Board, which was not the proper body to hold zoning hearings, held one open meeting to discuss the settlement. On August 24, the Forest View Civic Association moved to intervene as a defendant.

While the majority opinion apparently approves this *instanter* repeal of Illinois law for purposes of settling this lengthy litigation, I cannot, because Arlington Heights' failure to follow established *state* procedures has likewise deprived intervenors of the notice and opportunity for a hearing mandated by the *federal* constitution.

### B. Intervenors' Property Interest

"The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978).

The "property" right asserted by the Forest View Civic Association group of intervenors is its interest in ensuring that the property values of its member landowners will not be unnecessarily devalued through closed door rezoning of the neighboring tract from single family to multi-family and commercial classifications. Mount Prospect would appear to have an interest in minimizing any loss of revenues which might result from a depreciation of property values in the area, and an additional concern

---

**2.** While there would appear to be no impropriety in holding closed meetings for the purpose of discussing a possible settlement of pending litigation, the closed discussions went beyond the fact of settlement and encompassed matters which, as noted above, are required to be the subject of *public* hearings. This procedure contravened not only the relevant zoning legislation, but also the public policy of Illinois, as expressed in the Illinois Open Meeting Act:

It is the public policy of this State that the public commissions, committees, boards and councils, and other public agencies within this State exist to aid in the conduct of the peoples' business. It is the intent of this Act that their actions be taken openly and that their deliberations be conducted openly. Ill.Rev.Stat. ch. 102, § 41.

over increased expenditures which might be required of it in order to handle the increased traffic flow.

Both Mount Prospect and the Forest View Civic Association readily acknowledge that their respective interests would not entitle them unilaterally to block the annexation and rezoning of the tract. They contend, however, that their interests are constitutionally sufficient to require that notice and hearing which is in any event provided for by Illinois law, in order that policy and locational considerations surrounding the contemplated development can be resolved in such a way as to minimize the impact of the proposal.[3]

The test for what constitutes a property interest, within the meaning of the Due Process Clause, was set forth in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971):

> To have a property interest . . . a person must have more than a unilateral expectation . . . . He must, instead, have a *legitimate claim of entitlement* . . . . It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an *independent source such as state law* —rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709 (emphasis supplied). *See Leis v. Flynt*, 439 U.S. 438, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979); *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978); *Board of Curators v. Horowitz*, 435 U.S. 78, 82, 98 S.Ct. 948, 951, 55 L.Ed.2d 124 (1978); *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Goss v. Lopez*, 419 U.S. 565, 572–74, 95 S.Ct. 729, 735–36, 42 L.Ed.2d 725 (1975); *Perry v. Sinderman*, 408 U.S. 593, 602 n.7, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). An examination of intervenors' interests under Illinois law leads inevitably to the conclusion that such interests are "property interests."

First, the courts of Illinois have consistently concluded that adherence to the statutory notice and hearing procedures in zoning matters is *jurisdictional* to the ability of a municipal body to amend zoning classifications.[4] For example, in *Kirk v. Village of*

---

**3.** The district court discussed at great length the question of whether due process guarantees attach at all to zoning procedures, or whether such procedures are "legislative" and therefore beyond the reach of the due process clause a theory advanced in a recent student project, *Developments in the Law—Zoning*, 91 Harv.L. Rev. 1427 (1978). While the district court ultimately concluded that due process guarantees were applicable, I must take issue with the notion that "legislative" as opposed to "administrative" zoning decisions do not trigger due process protections in one form or another. The rationale expressed for this theory by both the district court and the Harvard article is that to accord due process to everyone affected by the legislative process would be so cumbersome as to make government unworkable. Although this justification has some facial appeal, the Constitution makes no such talismanic distinction. I would only observe that courts are not generally called upon to adjudicate the constitutional sufficiency of legislative proceedings

because the *legislative* process is in itself a form of *due* process. While obviously each citizen potentially affected by legislation cannot participate in the actual decisionmaking process, his or her elected representative may do so. *See also* L. Tribe, *American Constitutional Law* § 18–3 (1978) (discussing a trend in Supreme Court cases toward greater scrutiny of the legislative process in that the Court now seems unwilling to credit or manufacture bases for legislation that are not currently articulated by the body promulgating the challenged statute or rule, and analyzing the concept of legislative due process). In any event, we need not resolve the controversy here as the parties do not seriously dispute that due process guarantees had at least some applicability to this governmental act.

**4.** This point would also appear to be significant to another issue raised by Mount Prospect, specifically, whether the attempt by Arlington Heights to approve the decree was void.

*Hillcrest*, 15 Ill.App.3d 415, 417, 304 N.E.2d 452, 454 (1973), an application was filed for rezoning in subdivision 5 of a municipality. The notice, however, due to a clerical error, made reference to "subdivision 6." Hearings were held in conformity with the application, and rezoning of subdivision 5 was approved. The Illinois Court of Appeals held the rezoning void as to either subdivision 5 or 6, observing that:

> [t]he notice is mandatory, jurisdictional, and must correctly describe the subject property, otherwise any attempted amendment will be invalid. . . . Inasmuch as no notice of hearing was ever published, appropriate to the originally requested changes in Subdivision 5, neither the zoning board of appeals nor the defendant has jurisdiction to proceed. . . .
>
> The notice that was published granted the board jurisdiction to proceed with hearings on changes within Subdivision 6. The hearings were not held in accordance with the published notice. The uses in Subdivision 6 remain unchanged.

304 N.E.2d at 454. *Accord, Cosmopolitan National Bank of Chicago v. City of Chicago*, 27 Ill.2d 578, 583, 190 N.E.2d 352, 355 (1963) (actions taken outside of prescribed procedures are void); *North State Astor, Lake Shore Drive Association v. City of Chicago*, 131 Ill.App.2d 251, 253, 266 N.E.2d 742, 744 (1970) ("An amendment to a zoning ordinance passed without a public hearing is void."); *Lancaster Development, Ltd. v. Village of River Forest*, 84 Ill.App.2d 395, 400, 228 N.E.2d 526, 529 (1967).

Moreover, it is the law in Illinois that adjacent property owners have legally cognizable interests in zoning matters which are, for example, sufficient to entitle them to intervene as of right. *Anundson v. City of Chicago*, 44 Ill.2d 491, 256 N.E.2d 1 (1970); *Bredberg v. City of Wheaton*, 24 Ill.2d 612, 182 N.E.2d 742 (1960); *Wheeling Trust & Savings Bank v. Village of Mount Prospect*, 29 Ill.App.3d 539, 331 N.E.2d 172 (1975); *Oakton-Crawford Corp. v. Village of Skokie*, 28 Ill.App.2d 507, 171 N.E.2d 814 (1961); *accord, Planned Parenthood v. Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977); *cf. Nott v. Wolff*, 18 Ill.2d 362, 163 N.E.2d 809 (1960) (permissible for adjacent landowner to prosecute an appeal where developer successfully sued city to invalidate zoning ordinance and city failed to appeal). Similarly, with respect to Mount Prospect's interests, it has generally been recognized in Illinois and elsewhere that municipalities may also have legally cognizable interests in zoning matters which affect tracts contiguous to their borders. *See, e. g., Township of River Vale v. Town of Orangetown*, 403 F.2d 684, 685 (2d Cir. 1968) (municipality has standing to challenge amendment to zoning ordinance in a municipality across the state line, where an allegation is made that the rezoning will depreciate property values); *City of Hickory Hills v. Village of Bridgeview*, 67 Ill.2d 399, 10 Ill.Dec. 539, 541, 367 N.E.2d 1305, 1307 (1977) ("From an examination of the authorities . . . it would appear that the general rule that 'an aggrieved person with a real interest in the subject matter of the controversy may challenge a zoning ordinance' is applicable to municipal corporations.)"; *Forestview Homeowners Association, Inc. v. County of Cook*, 18 Ill. App.3d 230, 309 N.E.2d 763 (1974) (Village of Northbrook permitted to intervene in zoning litigation involving tract one and one-half miles outside its borders); *cf. Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 1613–14, 60 L.Ed.2d 66 (1979) (Village has standing to bring an action challenging alleged racial steering practices of realtors).

In view of the treatment of interests similar to intervenors' under state law, it is clear that those interests are property within the meaning of the Due Process Clause.

C. What Process Is Due

Although the district court did not seriously dispute the constitutional sufficiency of intervenors' property interests, it nevertheless concluded that the hearing on the merits of the decree before the district court itself was all the process that was due. In view of the fact that the district court was not the decisionmaking tribunal

in this instance, I fail to comprehend this reasoning. The gravamen of intervenors' claims is not that the decree was not a fair settlement as between the original parties to the litigation—the issue to be decided by the court—but rather that their own properties were depreciated or revenues decreased by the changes in zoning classifications which were decided upon in an irregular manner by the Village of Arlington Heights. The constitutional infirmity, which was created by the failure of Arlington Heights to accord the intervenors notice and an opportunity for a hearing, is not cured by the fact that the district court later accorded a hearing on the due process claim in the context of approving the consent decree. If such were the case, any claim of a deprivation of procedural due process in some other forum could be immediately remedied simply by the judicial hearing on the merits of the complaint.

As the express language of the district court opinion evidences, the district court did not and, indeed, could not reach a decision on the merits of the annexation and rezoning questions, but instead merely tested the decision of Arlington Heights to do so under a "fair and equitable" standard of review and determined that such measures were an acceptable resolution to the claims of discrimination made by the plaintiffs at the outset of this case. While the zoning and annexation may well be "fair and equitable," both as a means of settling this litigation and in the abstract, this does not cure the fact that the decision of Arlington Heights was made in a manner which was unlawful under the statutes of Illinois and which rode roughshod over intervenors' constitutional rights.

Neither do I find the majority opinion's reliance on *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) persuasive. In that case, the Supreme Court articulated three factors which must be weighed and considered in determining "what process is due," *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), in any given circumstance: (1) the private interest affected by the governmental action; (2) the risk of an erroneous deprivation through the procedure used; and (3) the governmental interests, including the fiscal and administrative burdens that the additional procedures would entail.

Where, however, as here, it is undisputed that the challenged government actions were taken without even minimal notice and hearing procedures, *see Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), it is simply unnecessary to engage in a *Mathews* analysis.

I would further respectfully submit that in the interests of federalism, where a procedural due process controversy relates to a local matter and adherence to state statutory procedures would cure the constitutional defect, a federal court should simply require that those state procedures be followed rather than engaging in its own mentations as to what a "fair and equitable" result of the never-held hearings might have been.

Further, Arlington Heights and the MHDC contend that even if intervenors were entitled to a notice and hearing under our Constitution, the holding of additional hearings at this juncture would be little more than a "sham" or a "mere formality," which would have no effect on the ultimate result. This argument, reduced to its essence, is that it is immaterial that intervenors were denied that degree of due process mandated by the United States Constitution and the laws of the State of Illinois, because Arlington Heights has, in any event, already made up its mind. I regard this as untenable.

The decision of Arlington Heights after hearings before the proper body might well be modified or even abandoned as a consequence of an accommodation to the land use, policy, and locational concerns of the intervenors. Secondly, this court should not assume that the proper decisionmaking bodies in Arlington Heights will be unable to function objectively in the future. An analogous situation was presented in *Hortonville Joint School District No. 1 v. Hortonville Educational Association*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

There the Supreme Court was confronted with the claims of teachers who, after a breakdown in collective bargaining negotiations, had gone on strike in violation of state law and subsequently been discharged by the Board of Education. The teachers alleged that the Board was not an impartial decisionmaking body, and that their rights to procedural due process had therefore been violated. The Court disagreed, noting, "[a] showing that the Board was 'involved' in the events preceding this decision . . . is not enough to overcome the presumption of honesty and integrity in policymakers with decisionmaking power." *Id.* at 496–97, 96 S.Ct. at 2316.

Finally, this "fait accompli" line of reasoning does not acknowledge what I had heretofore thought was a well established constitutional principle, specifically that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions . . . because of the importance to organized society that procedural due process be observed." *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978).

Procedural due process is said to serve three interests:

> First, due process assures that governmental decisions affecting individuals are made correctly and efficiently (the efficiency interest). Second, it permits the person affected by a decision to argue before the relevant body about the substantive rules that are to be applied and how they should be interpreted in the particular instance (the representational interest). Third, and last, it protects individual dignity by requiring that the government explain its actions to those directly affected (the dignity interest).

*Developments in the Law—Zoning*, 91 Harv.L.Rev. 1427, 1505 (1978). All three would be served by according intervenors that degree of constitutional protection to which they are entitled.

Because the intervenors were not accorded notice and an opportunity for a hearing, I respectfully dissent.